UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

Scott Nash,  )
 )
    Plaintiff,  )
 )
v.  )  No. 15 CV 50019
 )  Magistrate Judge Iain D. Johnston
Carolyn W. Colvin, Acting  )
Commissioner of Social Security,  )
 )
    Defendant.  )

## MEMORANDUM OPINION AND ORDER

Plaintiff Scott Nash brings this action under 42 U.S.C. §405(g), challenging the denial of social security disability benefits.

## BACKGROUND

On December 12, 2011, plaintiff filed applications for disability insurance benefits and supplemental security income. He was 35 years old.

On June 18, 2013, a hearing was held before an administrative law judge ("ALJ"). Plaintiff testified that his back was sore from a recent weather change, which "definitely affects [his] back." R. 50. He drove about 30 minutes to the hearing. He lived with his wife, who works, and step-daughter, who is eight years old. During the summer, plaintiff would play board games with his step-daughter or do "something simple just to keep her entertained." R. 52.

Plaintiff takes 500 milligrams of Vicodin for pain ("probably about four times a week"); Soma, a muscle relaxer, every night; Trazadone and Zoloft also every night; and melatonin as needed for sleep. The Soma makes him "loopy," even the day after it is taken. R. 57. He used heating pads for his back and tried physical therapy in 2006-07 but it did not help. His typical day is as follows:

1

> I'll get up and I will let my two dogs out. They're just small dogs. They only have to get let out a couple times a day. Then I'll typically grab a bowl of cereal or something like that and depending on my pain level I'll try to figure out how I can help a little bit of my wife's day, you know. Take a little load off from her cause she does a lot. So whether it's going to the grocery store, say, five minutes away and grabbing a couple groceries then I'll try to do that. I'll try to force myself to do something every day.

R. 53.

His pain is primarily in his left ankle, with occasional pain in his right ankle. He has had the ankle pain for a "[v]ery, very long time." R. 55. He injured his back in 2006, and it has "just progressively gotten worse." *Id.* His exercise is "[v]ery minimal":

> I can walk maybe 15 minutes throughout the day but that's about—after that the pain starts really ramping up in my ankle and if I go much more than that to maybe like past a half an hour then it's usually I'm on the couch with an ice pack and some Vicodin. So I really try to limit my activities.

R. 59. He "can sit about 15 minutes" but has to "constantly change positions from sitting to laying down to standing up." R. 60. He uses crutches two or three times a month. His wife is the primary grocery shopper, but he will sometimes help by grabbing a few things from the store, which is five minutes away. He stated that he will "almost use the cart as a crutch" and will "get in and get out as soon as [he] can to get only the necessities." R. 61.

He had injections in his back but they did not provide much relief. He sometimes has to elevate his ankle during the day: "If I walk much more than 30 minutes it will usually start to swell and I'll have to ice it and elevate it. That's the only time I really get much relief from it is if I take Vicodin, elevate it, and ice it." R. 66. He elevates his ankle approximately four times a week. He has no problems getting along with others and typically finishes what he starts.

On August 2, 2013, the ALJ found plaintiff not disabled. She found that he had the following severe impairments: "osteochondroitis dessicans in both ankles, left greater than right,

2

with pain and intermittent antalgic gait; degenerative disc disease of the lumbar spine, with chronic low back pain; and obesity." R. 29. As discussed below, she found that he did not meet a listing. She found that he had the residual functional capacity ("RFC") to perform sedentary work. She gave "no weight" to the opinion of plaintiff's treating physician, another conclusion plaintiff now challenges.

## DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). A reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Moreover, federal courts cannot build this logical bridge on behalf of the ALJ or Commissioner. *See Mason v. Colvin*, 2014 U.S. Dist. LEXIS 152938, at *19 (N.D. Ill.

3

Oct. 29, 2014). In this appeal, plaintiff raises four arguments in his oversized brief. As discussed below, the Court finds that several of them collectively require a remand.

I.     **The Listing Argument**

Plaintiff argues that the ALJ failed to explain "with a sufficient level of detail" why his ankle and walking problems did not satisfy listing 1.02A. This listing states the following:

> **1.02** *Major dysfunction of a joint(s) (due to any cause)*: Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e. hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;
>
> OR
>
> B. Involvement of one major peripheral joint in each upper extremity (i.e. shoulder, elbow, or wrist-hand), resulting inability to perform fine and gross movements effectively, as defined in 1.00B2c.

The key phrase—"inability to ambulate effectively"—is defined in 1.00B2b as follows:

> b. What we mean by inability to ambulate effectively.
>
> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity function [] to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. []
>
> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out the activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The inability to walk

4

independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

Listing 100.B2b(1) & (2).

In her opinion, the ALJ did not quote from the above provisions, but only gave the following analysis for why plaintiff did not meet this listing:

> The claimant's disc disease does not meet or medically equal the requirements of listing 1.04, as there is no evidence of spinal nerve compression with radiculopathy, arachnoiditis or spinal stenosis with pseudoclaudication, and inability to ambulate. The claimant's bi-lateral ankle disease does not meet the requirements of listing 1.02A, because despite his pain, he remains able to ambulate effectively as defined in 1.00B2b.

R. 32.

Plaintiff argues that this two-sentence "analysis" is perfunctory and overlooks relevant evidence. This Court agrees. The ALJ's explanation—that plaintiff "remains able to ambulate effectively"—is only a conclusion. There is no analysis; for example, there is no acknowledgement that plaintiff could possibly satisfy one of the six examples from 1.00B2b. There is likewise no discussion of the specific evidence, either favorable or unfavorable. The ALJ even admits that plaintiff is suffering from some type of pain related to walking, but does not offer any analysis of why this pain is not debilitating.

Plaintiff argues that this type of cursory analysis requires a remand under Seventh Circuit case law. The Court agrees. For example, in *Moss v. Astrue*, 555 F.3d 556 (7th Cir. 2009), the Seventh Circuit remanded because the ALJ failed to sufficiently analyze whether the plaintiff's ongoing ankle problems met the ambulation requirement. The Seventh Circuit found that the ALJ failed to "adequately consider" the list of examples set out in 1.00B2b, a list which the court noted was "nonexhaustive." *Id.* at 562-63. The Seventh Circuit found that the ALJ's reference to

selected pieces of evidence, such plaintiff "occasionally walk[ing] around the block," was not adequate.[1]

The Government does not discuss *Moss* and related cases, but instead responds with several other points. The Government first notes that, although 1.00B2b lists six examples of ineffective ambulation, plaintiff has only argued he fits within one of them—the "inability to walk a block at a reasonable pace on rough or uneven surfaces." Dkt. #25 at 4. This is more an observation than an argument. In any event, the regulations contain no suggestion that a claimant must fit within more than one example. As *Moss* indicates, the six examples are non-exhaustive. Even if the Government were correct about one example not being enough, it does not appear that plaintiff limited his argument solely to one, as he cited at least one other in his opening brief—"inability to carry out routine ambulatory activities"—although it should be noted that he did not provide much analysis. *See* Dkt. #18 at 8.

The Government next suggests that plaintiff's listing argument is weak because he relies "solely" on "one note in the record." Dkt. #25 at 4. This is a doctor's note from plaintiff's February 9, 2012 visit to Dr. Michalsen.[2] R. 299. One of Dr. Michalsen's observations in this note was that plaintiff—as quoted in his opening brief—"walked with difficulty." Dkt. #18 at 8. The government argues that this is a misquotation, creating a misleading impression. This argument is flawed in several respects.

---

[1] Other Seventh Circuit and district court cases have likewise remanded under similar circumstances. *See Minnick v. Colvin*, 775 F.3d 929, 935-36 (7th Cir. 2015) (ALJ's two sentence explanation was "the very type of perfunctory analysis we have repeatedly found inadequate to dismiss an impairment as not meeting or equaling a Listing"); *Kastner v. Astrue*, 697 F.3d 642, 647 (7th Cir. 2012) (ALJ provided only a "cursory" analysis of the listing); *Denton v. Colvin*, 2016 WL 4472858, *3 (S.D. Ind. Aug. 25, 2016) ("Just as in *Minnick*, the ALJ in this case dismissed the possibility of Denton's back and knee impairments meeting or equaling Listing 1.02's criteria[.]"); *Mitchell v. Colvin*, 2014 WL 5509330, *4-5 (S.D. Ind. Oct. 31, 2014) (remanding based on *Moss* because the ALJ "did not assess whether [all the] examples of ineffective ambulation were met").

[2] In the briefs, Dr. Michalsen's name is spelled different ways. The Court has used the above spelling, which it believes is correct, and has inserted this version in any quotations containing different spellings.

First, the Court is not persuaded that this should be viewed as a misquotation—at least in any meaningful sense. Here is the disputed phrase quoted in context:

> Gait and ability to bear weight: He is able to walk with difficulty, would guard his left ankle. He states once a month he uses crutches and a walking boot, other than that he walks without it.

R. 299. In his opening brief, relying on this passage, plaintiff states: "The ALJ failed to discuss Dr. Michalsen's observations that Mr. Nash 'walked with difficulty' and guarded his left ankle (AR 299)." Dkt. #18 at 8. In response, the Government argues the following:

> That is not exactly what Dr. Michalsen said, however. Rather, Dr. Michalsen wrote that plaintiff is "able to walk with difficulty." (Tr. 299.) Thus, in misquoting Dr. Michalsen, plaintiff made it seem that Dr. Michalsen reported only that plaintiff "walked with difficulty," a phrase which emphasizes plaintiff's limitations, whereas what Dr. Michalsen actually wrote, that plaintiff "is able to walk with difficulty," a phrase which emphasizes plaintiff's abilities.

Dkt. # 25 at 4. It is a stretch to assert that plaintiff misquoted the report. To begin with, in a trivial sense, there was a slight change when plaintiff used the past tense ("walked") in the phrase "walk with difficulty." But surely this is not the basis for the Government's argument. Perhaps slightly more substantive, plaintiff left off the phrase "is able to" in front of the phrase. But here again, the semantic difference is so hard to discern that it amounts to hair-splitting. The Court finds little difference in the two versions. And, as the Government implicitly concedes, both are permissible interpretations, just with different emphases. Therefore, it is not surprising that plaintiff chose the one more favorable to his case, which is a choice within the bounds of fair advocacy.

Second and more substantively, what is missing from this nitpicking over one phrase is the larger import of Dr. Michalsen's note. The Government overlooks other statements in the note. As plaintiff points out, Dr. Michalsen also noted that plaintiff would "guard his left ankle" (R. 299), that "he walks with a limp guarding his left ankle" (R. 298), and that he "is able to walk

7

two to three steps on his toes until he had pain and he was unable to walk or stand on his heels due to the pain" (*id.*). Dkt. #18 at 8-9. This evidence provides support for plaintiff's argument.

Third, contrary to the Government's argument, plaintiff did not rely solely on this one note. In his opening brief, plaintiff points to other evidence, including his testimony that he had difficulty doing daily activities such as grocery shopping (where he had to lean on the cart as a crutch), the ALJ's conclusion that he had an "intermittent antalgic gait," plaintiff's obesity, and, as discussed below, Dr. Anderson's opinion that plaintiff met this listing.

The Government finally argues that the ALJ addressed some of this evidence later in the RFC discussion. Dkt. #25 at 5 (citing *Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015)). However, the Government never goes on to explain how this later discussion illuminates the ALJ's path of reasoning specifically relating to Listing 1.02A and the six examples in 100.B2b. It is true, as the Government suggests, that there is evidence arguably undermining plaintiff's claim that he meets the listing. Indeed, the record is replete with evidence from which a strong case for denying benefits could be made. But at this point this argument has not been fully articulated, particularly by the ALJ. And this Court cannot articulate the argument for the ALJ. *See Mason*, 2014 U.S. Dist. LEXIS 152938, at *19. In sum, a remand is required so that a more detailed explanation can be provided. On remand, the ALJ can locate the record evidence and build a logical bridge to a conclusion that benefits should be denied, but, under the facts of this case, the Court is not going to—and should not—engage in that process on appeal.

## II.     The Treating Physician Rule.

Plaintiff argues that the ALJ failed to follow the treating physician rule by not applying the checklist of factors and by making various errors and unjustified assumptions in giving the

8

opinion of Dr. Kimberland Anderson "no weight." Although the ALJ did discuss Dr. Anderson's opinion, the Court finds that the discussion did not satisfy the treating physician rule.

On April 30, 2013, Dr. Kimberland Anderson completed a four-page form, answering several checkbox-style questions and adding some handwritten comments.[3] *See* Ex. 11F. Dr. Anderson had seen plaintiff twice over a three-month period. Dr. Anderson offered several opinions, including that plaintiff had significant limitation in range of motion (percentage figures are given for various movements), that his medication had the "potential" for causing drowsiness, dizziness, and nausea, and that he would be off task 20% of the time in a typical work day. R. 332, 334, 335. The form quoted the requirements of Listing 1.02A and asked whether plaintiff met the standard. Dr. Anderson indicated that plaintiff did based on "instability; difficulty walking." R. 333. Another question asked about four of the six examples from 100.B2b. Dr. Anderson answered that plaintiff could not do any of the four examples—in other words, he met the "ineffective ambulation" requirement in several different ways. R. 333.[4]

This case is just another example in a long line of cases that requires remand because an ALJ failed to comply with the treating physician rule. *See, e.g., Booth v. Colvin*, 2016 U.S. Dist. LEXIS 82754, *9 (N.D. Ill. June 27, 2016) (collecting over a dozen cases from the magistrate judges of Northern District of Illinois in the last two years remanding because of an improper application of the treating physician rule). At some point, this pervasive, systemic analytical error must end.

The treating physician rule is based on 20 C.F.R. §404.1527(c)(2). Under this section, a treating physician's opinion is entitled to controlling weight if it is supported by medical findings

---

[3] The form appears to have been created by Guardian Disability Advocacy, or least this company's name is at the top of the form. R. 332.
[4] The four examples were walking a block at a reasonable pace on rough or uneven surfaces, using public transportation, carrying out routine activities including shopping, and climbing a flight of stairs at a reasonable pace using only a single hand rail. R. 333.

and consistent with other substantial evidence in the record. *Id.*; *Moore v. Colvin*, 743 F.3d 1118, 1127 (7th Cir. 2014). If the ALJ does not give the treating physician's opinion controlling weight, the ALJ cannot simply disregard it without further analysis. *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010). Instead, the ALJ must determine what specific weight, if any, the opinion should be given. *Moss¸* 555 F.3d at 561. To make this determination, the ALJ must apply the checklist of factors set forth in 20 C.F.R. §404.1527(c)(2). *Campbell*, 627 F.3d at 308 (referring to the factors as a "required checklist"); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008).[5] Failure to apply checklist is reversible error. *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (ALJ disregarded checklist); *Moss*, 555 F.3d at 561 ("the choice to accept one physician's opinions but not the other's was made by the ALJ without any consideration of the factors outlined in the regulations"). Similarly, ALJs commit reversible error by simply stating that they considered the checklist without showing in their decisions that they did, in fact, consider them. *See Campbell*, 627 F.3d at 308. In other words, ALJs must show their work.

Here, the ALJ failed to follow this two-step process—at all. Initially, the ALJ completely ignored the first step of the analysis. Moreover, the ALJ never explicitly analyzed the six factors under the checklist. It is true that the ALJ did not ignore Dr. Anderson's opinion entirely and provided several arguments to justify the conclusion. However, this Court takes the view that an explicit analysis is still required. *See Duran v. Colvin*, 2015 U.S. Dist. LEXIS 101352, *8-9 (N.D. Ill. Aug. 4, 2015). But even if the Court allowed an implicit analysis, the ALJ failed to properly apply the checklist based on several criticisms raised by plaintiff. *See Koelling v. Colvin,* 2015 U.S. Dist. LEXIS 14074, *28-29 (N.D. Ill. Oct. 16, 2015).

---

[5] The factors are: (1) the length of treatment; (2) the nature and extent of the treatment relationship; (3) the supportability of the medical opinion; (4) the consistency of the opinion with the record as a whole; (5) the physician's degree of specialization; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)(i)-(ii), (c)(3)-(6).

10

The first reason offered by the ALJ for rejecting the opinion is that Dr. Anderson "made the assessment after only 2 visits." R. 37. This rationale comes the closest to matching up with a checklist factor (the first one, length of treatment). But as plaintiff notes, the ALJ was inconsistent by asserting this criticism against Dr. Anderson, but then at the same time relying, albeit only in part, on the opinions of agency doctors who *never* examined plaintiff. In its response brief, the Government does not address this argument, but instead notes that length of treatment "was but one of the regulatory factors the ALJ considered." Dkt. #25 at 7. This seems to be an implicit concession that the ALJ used this factor selectively to cherry-pick the end result. The Government also notes generally that the length of treatment is important because a physician who sees a patient "a number of times" has a "longitudinal picture" of the claimant's condition. *Id.* This point is true, but not especially illuminating here. There is no competing opinion from another doctor who saw plaintiff more than two times. The ALJ's rationale seems to rest on a blanket conclusion that no doctor could ever render a valid opinion after only two visits. This view cannot be correct. Indeed, it is a view that the Commissioner should be hesitant to take in light of her constant reliance on agency doctors and medical experts who never examine claimants. Additionally, this argument is not only contrary to many Social Security cases, where ALJs routinely rely on medical opinions rendered after a single or even no visit, but it also fails to consider whether additional visits would have made a difference. For example, is it possible that plaintiff's condition was temporary such that it might improve over time? What additional objective tests should have been performed? What expertise did Dr. Anderson have in this area? These are valid questions and ones that may eventually lead to arguments supporting the ALJ's conclusion. But for now, the answers to these questions are murky, leaving the ALJ's rationale resting on this shaky foundation.

The second reason the ALJ offered is that Dr. Anderson's opinion is supposedly inconsistent. The ALJ stated that "Dr. Anderson reports that the identified limitations have been present since 1998, yet the claimant has worked at several jobs that required standing a full day since then." R. 37. The Government argues that the ALJ was justified in relying on this inconsistency. But as plaintiff points out, the ALJ overlooked the degenerative nature of his conditions, which he claims have grown more severe over time. Plaintiff's point is valid. Moreover, as further support of plaintiff's argument, the Court notes that the ALJ found a contradiction by placing much weight on Dr. Anderson's answer to one, arguably ambiguous question; namely: "In your opinion, given the past medical records sent, what is the earliest date that the description of *symptoms and limitations* in this questionnaire applies?" R. 335 (emphasis in original). Dr. Anderson answered: "1998." *Id.* The ALJ interpreted this answer to mean basically that plaintiff's current condition, in its most advanced and most disabling form, existed since 1998. But another equally reasonable interpretation (in fact, a more reasonable interpretation) is that Dr. Anderson was merely stating that 1998 was the first date that *any* of these *symptoms*, even in their most nascent form, first appeared. Under this interpretation, there would not be an inconsistency with plaintiff being able to work for a period until the problems progressively worsened. For these reasons, the Court finds that this second rationale, like the first, rests on assumptions that have not been fully explored or explained. Although the ALJ went on to give a few additional reasons, as discussed below, the ALJ nonetheless stated that the above two reasons alone were enough to "undermine[] the entire weight of Dr. Anderson's assessment." R. 37.[6]

---

[6] It should be noted that the proper application of the treating physician rule should result in the total rejection (*i.e.*, assigning "no weight") of the treating physician's opinion only on rare occasions. *See* SSR 96-2p ("A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It

Another of the ALJ's reasons that plaintiff now criticizes is the assertion that Dr. Anderson's opinion conflicted with a recommendation of Dr. Vaewhongs who allegedly advised plaintiff to "increase his current sedentary activity level." R. 37, 364. Plaintiff argues that this one observation is not inconsistent with Dr. Anderson's larger conclusions because "[p]atients often engage in activities such as walking in order to reap the therapeutic benefits despite the pain that the increased activity may cause." Dkt. #18 at 17 (citing *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) (ALJ "failed to consider the difference between a person's being able to engage in sporadic physical activities [which included walks as long as two miles] and her being able to work eight hours a day five consecutive days of the week")). This Court agrees. In reviewing Dr. Vaewhongs' note, the reference to exercising more is in the section addressing plaintiff's obesity problems and the advice appears to be a set of standard recommendations about dieting and exercise likely given to every patient with weight issues. For example, it recommends "regular aerobic exercise (regular means at least 30 minutes per day and at least 4 times per week) (aerobic means you sweat)." R. 364. Yet, earlier in this same note, Dr. Vaewhongs wrote that plaintiff "can only walk and stops due to left ankle pain." R. 363. There is no indication that Dr. Vaewhongs doubted the latter claim. Thus, when read fairly in its entirety, this note does not express any clear doubt about plaintiff having difficulties walking.

For the above reasons, the Court finds that a remand is warranted under the treating physician rule. In reaching this conclusion, the Court is not dictating any result on remand, nor holding that the ALJ's reasons, if more fully explained, cannot be relied on in a future analysis. As noted previously, the record contains substantial evidence that, if marshalled properly and fully explained, would support the denial of benefits.

---

may still be entitled to deference and adopted by the adjudicator."). The repeated penchant for assigning no weight—zero—is a habit that the Administration should address.

**III. The Credibility Argument.**

Plaintiff argues the ALJ wrongly drew a negative inference from his lack of treatment generally and specifically from his failure to pursue ankle surgery. Plaintiff also faults the ALJ for relying on the fact that Dr. Anderson did not refer him to a specialist. Although this issue was only a small part of the ALJ's overall reasoning, the Court agrees with plaintiff. It is well-established that an ALJ has a duty to first ask a claimant about, and explore a claimant's explanations regarding, treatment inconsistencies before drawing any negative adverse inferences. *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (an ALJ cannot "rely on an uninsured claimant's sparse treatment history to show that a condition was not serious without exploring why the treatment history was thin"); *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) ("although the ALJ drew a negative inference as to Craft's credibility from his lack of medical care, she neither questioned him about his lack of treatment or medicine noncompliance during that period, nor did she note that a number of medical records reflected that Craft had reported an inability to pay for regular treatment and medicine.").

The ALJ did not comply with this rule. The Government argues that the ALJ did consider plaintiff's explanations for treatment failures. As for the specific issue of why he did not have ankle surgery in 2011, the ALJ did acknowledge that plaintiff reported that "he could tolerate his current pain and he could not afford to see an orthopedic surgeon." R. 36. However, as plaintiff points out, it is not clear what weight, if any, the ALJ gave to this explanation. The ALJ never commented one way or another on the explanation. Instead, the ALJ found that plaintiff's decision not to pursue surgery showed a lack of credibility, which logically suggests that the ALJ gave no weight to it. On remand, the ALJ should address this issue more directly. As for the ALJ's comment that Dr. Anderson had not referred him to a specialist, plaintiff argues that the

14

ALJ failed to consider whether "referral to a specialist would have been appropriate and did not explain what aggressive pain management treatment was available to Mr. Nash" and finally "impermissibly speculated that such treatment was available and appropriate." Dkt. #18 at 19. These are legitimate questions, and also should be addressed on remand.

* * *

Based on the above arguments, the Court finds that a remand is required. Many of plaintiff's other arguments are substantially weaker and probably do not justify remand on their own. Given the decision to remand for the errors noted above, the Court need not address plaintiff's remaining argument that the ALJ made various errors in the RFC finding.[7] Some of these arguments are versions of earlier arguments (*e.g.* the ALJ failed to rely on Dr. Anderson's opinion) and others focus on discrete factual issues (*e.g.* plaintiff's alleged need to elevate his ankle and his need to lie down). These issues should be addressed on remand, despite their weakness so as to avoid another appeal that would raise them.

## CONCLUSION

For these reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

Date: September 14, 2016          By: _____
                                      Iain D. Johnston
                                      United States Magistrate Judge

---

[7] The Court notes that it granted plaintiff's motion to file an oversized brief. Dkt. ##16, 17. Plaintiff's counsel repeatedly makes that motion. These motions, even if agreed, will no longer be granted absent a compelling reason. "Kitchen sink" memoranda cause unnecessary work for the Government and the Court and generally contain unpersuasive arguments (as in this case) that only serve to cheapen and distract from the arguments with merit.